UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 00-CV-09109-Hurley/Hopkins

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

vs.

KEITH GREENBERG,

        Defendant.
_____/



## REPORT AND RECOMMENDATION

**THIS CAUSE** is before this Court upon referral to the undersigned United States Magistrate Judge for a report and recommendation (DE 29). On November 26, 2013, the Securities and Exchange Commission ("SEC") filed an Application for an Order to Show Cause why Defendant Keith Greenberg should not be held in Contempt of Court and Supporting Memorandum of Law (DE 27). The District Court granted the Motion for an Order to Show Cause and referred the matter to the undersigned to conduct an evidentiary hearing and thereafter issue a report and recommendation upon the request that Defendant be held in contempt for violating the Final Judgment entered in this case (DE 29).

The undersigned held a series of status conferences before ultimately holding a contempt hearing on October 15 and 16, 2014, and November 3, 2014 (DE 54, 57, 61). At the hearing, the parties offered witness testimony and exhibits, which were admitted into evidence by the Court. At the conclusion of the hearing and at the request of the parties, the Court held the record open and allowed the parties to submit additional evidence and closing statements. These documents

were submitted on February 13, 2015 (DE 63, 64). The matter is now ripe for this Court's review. For the reasons that follow, this Court **RECOMMENDS** that the District Court hold Defendant, Keith Greenberg, in Contempt.

## BACKGROUND

On October 4, 2002, the Court entered Final Judgment against Defendant Keith Greenberg in the amount of $5,915,346 (DE 26). The Judgment is based on charges by the SEC that Defendant acted as a *de facto* officer of a public company, despite an injunction which permanently barred him from acting in such a capacity (DE 27-1, p. 2). The Judgment is comprised of a civil penalty, disgorgement[1], and prejudgment interest; postjudgment interest has been accumulating at a rate of $288.00 per day since the Judgment was rendered so that the amount due is considerably higher than the original Judgment. The only substantial payment to date is a payment for $114,592.35 made on August 11, 2011 following the SEC's demand that Defendant remit the net proceeds of a condominium sale toward partial satisfaction of the Judgment. Otherwise, Defendant began making monthly payments of $2,500 to $3,750 in March 2014 (Def. Exh. 20), several months after the SEC sought an order holding Defendant in contempt. Defendant contends that these monthly payments total fifty percent of his monthly net income derived, ostensibly, from consulting contracts.

At the time the Judgment in this case was entered in 2002, Defendant and his wife owed the Internal Revenue Service ("IRS") more than $2,000,000 for tax deficiencies and penalties,

---

[1] "Disgorgement orders operate to 'wrest[ ] ill-gotten gains from the hands of a wrongdoer . . . A disgorgement order is more like an injunction for the public interest than a money judgment . . . It is this feature, the similarity to an injunction, that allows disgorgement orders, unlike judgments, to be enforced by civil contempt.'" *S.E.C. v. Solow*, 682 F. Supp. 2d 1312, 1324 (S.D. Fla. 2010) *aff'd,* 396 F. App'x 635 (11th Cir. 2010), (citing *Steffen v. Gray, Harris & Robinson, P.A.*, 283 F. Supp. 2d 1272, 1282 (M.D. Fla. 2003)).

with interest accruing daily. In August 2005, the IRS approved Defendant's and his wife's request to make installment payments of $8,850 per month; the amount due at that time was roughly $7,750,000. From 2006-2008, the IRS served a series of Notices of Intent to Levy in various amounts. Defendant and his wife made partial payments based on their available funds, which, because they do not maintain personal bank accounts, were funds that were withdrawn from various business entities which Defendant or his wife manage. In December 2013, the IRS wrote off a balance of approximately $5 million and released two liens. As of October 2014, the IRS has an outstanding lien against Defendant and his wife in the amount of $675,000. It is unclear whether Defendant currently has an agreement with the IRS concerning the remaining amount due or is paying anything towards the existing lien.

The SEC now seeks to have Defendant held in contempt. The SEC states that although Defendant claims an inability to satisfy part or all of the judgment against him, Defendant has, since the date of the Judgment, been using alter ego companies to pay personal expenses in the millions of dollars. Therefore, the SEC seeks to have Defendant ordered to repatriate and liquidate his assets and provide a full and complete accounting of his assets and income. In the event Defendant refuses to cure his contempt through such remedies, the SEC seeks to have Defendant incarcerated.

## **FINDINGS OF FACT**

The facts in this case are complex and involve a variety of legal entities, both domestic and foreign. At the heart of the various entities is an irrevocable trust created in 1996 known as the Elise Trust. The creation and funding of the Elise Trust are not at issue in this proceeding[2]

---

[2] The fact that the SEC is not attacking the creation and initial funding of the Elise Trust distinguishes this case from *Solow*, a case relied on by the SEC. *See Solow*, 682 F. Supp. 2d

(DE 50-1, p. 2), but it is important to note that the Elise Trust was initially settled and funded by Defendant's wife, Elise Greenberg, and as the grantor, she is taxed on the trust proceeds. At its inception, the Elise Trust was intended to benefit Defendant, his wife, and the couple's two children. The Trustee of the Elise Trust is a company located in Gibraltar called First Rock Trustees Limited, which at various times has acted through Directors Bernard Hazel, Cindy Glasby, and John Caetano. Defendant and his wife act as trust advisors and managers for the Elise Trust's day-to-day operations.

The Elise Trust owns a condominium in Miami which Defendant and his wife have leased since 2011 and where Defendant and his family primarily reside. Prior to purchasing this condo, the Elise Trust owned another unit in the same building in Miami which was also leased and used by Defendant and his family. It is the prior sale of this unit which led to the only substantial payment on the Judgment in this case. When not residing in the Miami condo, Defendant and his family spend time at a home in Goldens Bridge, New York, which is leased to them by the owner of the property, Raintree Development Irrevocable Trust ("Raintree Trust"). The particulars of the creation and funding of the Raintree Trust are unclear, and Defendant testified that the Raintree Trust maintains no independent accounting records because it does not have any income. Nevertheless, Defendant testified that expenses for the New York home are routed through various entities owned by the Elise Trust. At each home, Defendant and his wife have access to two vehicles, including an Aston Martin (purchased in 2008 for $157,875.29), a Mercedes, a Land Rover, and an Audi. These vehicles are owned or leased by either the Elise

---

1312. In *Solow*, the Court found that the contemnor had engaged in a purposeful campaign of asset dissipation between the jury trial in his case and the entry of the final judgment. *See id.* at 1314. In the instant case, the Elise Trust was settled approximately six years prior to the Complaint being filed, and four years prior to the Judgment being entered against Defendant.

Trust or the Raintree Trust. In the vicinity of each home, Defendant has an expensive private golf membership, paid for by the Elise Trust through associated entities. The vehicles and golf memberships have been labeled by Defendant and Trustee Director Bernard Hazel as business expenses.

The primary entity used by the Elise Trust for operational activities is a New York LLC formed in 2003 known as Braintree Properties, LLC ("Braintree"). Throughout 2004, Braintree's initial funding, which came from an entity known as Elise King, LLC, was used to invest in hyperbaric wound treatment centers in New York and elsewhere. Since its inception, Braintree has been jointly managed by Defendant and his wife, but is 100% owned by the Elise Trust. Shortly after Braintree was formed, the return on investments became the primary, if not sole, source of Braintree's income.

The SEC alleges that for a number of years, Braintree and the companies it owns were used by Defendant and his family to pay personal expenses, including personal credit card payments, and rent and expenses relating to renovations done to the Miami condo, among a host of other expenses. Defendant has acknowledged that he used Braintree to pay personal expenses (Pl. Exh. 23), but the exact ratio of personal to business expenses remains unclear. Furthermore, it is unclear what portion of the personal expenses was personal to Defendant, as opposed to his wife or their two children. At no point in this proceeding has Defendant provided an accounting of his expenses or sought to reclassify those expenses which the SEC has labeled as personal. In any event, records produced by Defendant's accountant indicate that between June 2006 and September 2011, personal expenses disbursed for the benefit of Defendant or his family members total $2,151,753 (Pl. Exh. 8).

In 2006, several of the hyperbaric treatment centers which were owned by the Elise Trust were sold to an entity known as the Center for Wound Healing ("CFWC"). After the sale, some accounting issues arose relating to disbursements the related entities had made to Defendant's family prior to the sale. As a result of those issues, several individuals and entities, including Defendant, his wife, the Elise Trust, Braintree, Raintree Trust, J.D. Keith LLC (Defendant's consulting firm), and CFWH entered into a settlement agreement in September 2007 (Pl. Exh. 20). In the opening paragraph of that agreement, it is specified that Defendant shall be referred to in his individual capacity as "Keith." Paragraph 2.10 of that agreement states that CFWH would pay "Keith or his designee" a total of approximately $600,000 over five years. Furthermore, per paragraph 5.1, "Keith" was to be provided with a two-year automobile expense allowance worth $38,400, and per paragraph 5.2, "Keith" was to be reimbursed by CFWH for "all reasonable entertainment expenses and travel costs." Thus, under the terms of the settlement agreement, Keith was entitled to receive $638,400 plus expense reimbursement from CFWH between September 2007 and August 2012.

Although Defendant was entitled to the settlement proceeds under the settlement agreement, these proceeds were made payable to J.D. Keith LLC, Defendant's consulting firm. According to records produced by CFWH, CFWH paid JD Keith $635,538 between October 2007 and September 2009. Those same records indicate that Defendant was personally paid approximately $83,000 by CFWH between June 2004 and May 2006.

In addition and prior to the settlement agreement, the predecessor to CFWH, American Hyperbaric, had a consulting agreement with J.D. Keith whereby J.D. Keith was paid $10,000 per month for a period of approximately 22 months (December 2005-September 2007) for a total

of $220,000. Thus, between the settlement agreement with CFWH and the consulting agreement with American Hyperbaric, Defendant and J.D. Keith received income between 2004 and 2009 of at least $938,000. And according to Defendant, "I believe I used the income from J.D. Keith to, to, you know, pay for some personal expenses" (DE 62, p. 25).

After the SEC began its investigations into Defendant's spending habits, a new company, Vantage Beach Holdings, LLC ("Vantage Beach"), was formed in December 2010. Since that time, Vantage Beach has replaced Braintree as the primary vehicle for the Elise Trust's investments and expenses. Vantage Beach is 100% owned by the Elise Trust, but it is managed by Defendant, who regularly co-mingles both his and his wife's income in the account. Defendant's Miami condo serves as the main office for Vantage Beach.

There is less documentation concerning Defendant's more recent earnings and spending habits, but at the very least, it is clear that Defendant personally earned $45,000 in both 2013 and 2014 from an entity called U.S. Cardiovascular, LLC (Def. Exh's. 22, 23).

## CONCLUSIONS OF LAW

Courts have inherent power to enforce compliance with their lawful orders through civil contempt. *See Shillitani v. U.S.*, 384 U.S. 364, 370 (1966). In a civil contempt proceeding, the petitioning party has the burden to establish by "clear and convincing" proof that the underlying order was violated. *See Newman v. Graddick*, 740 F.2d 1513, 1525 (11th Cir. 1984). "This burden of proof is more exacting than the 'preponderance of the evidence' standard but, unlike criminal contempt, does not require proof beyond a reasonable doubt." *Jordan v. Wilson*, 851 F.2d 1290, 1292 (11th Cir. 1988) (per curiam). The clear and convincing proof must demonstrate that: "1) the allegedly violated order was valid and lawful; 2) the order was clear and

unambiguous; and 3) the alleged violator had the ability to comply with the order." *See Georgia Power Co. v. N.L.R.B.*, 484 F.3d 1288, 1291 (11th Cir. 2007).

Once the petitioning party meets its burden, the burden shifts to the alleged contemnor to show an inability to comply. *See Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir. 1992). To succeed on an inability defense, the alleged contemnor must go beyond a mere inability and establish that he or she has, in good faith, undertaken "all reasonable efforts" to meet the terms of the order in question. *See id.*; *see also Combs v. Ryan's Coal Co.*, 785 F.2d 970, 984 (11th Cir. 1986), *cert. denied*, 479 U.S. 853 (1986) ("We construe this requirement strictly. 'Even if the efforts he did make were "substantial," "diligent" or "in good faith," . . . the fact that he did not make "all reasonable efforts" establishes that [respondent] did not sufficiently rebut the. . . prima facie showing of contempt.'") (quotation omitted). When an order requires a party to pay a certain sum, a showing by the alleged contemnor that he or she was unable to pay the entire amount is insufficient to avoid being held in contempt; instead, the alleged contemnor must be able to show an inability to pay any portion of the amount in question. *See, e.g., Piambino v. Bestline Products, Inc.*, 645 F. Supp. 1210, 1214 (S.D. Fla. 1986) ("[A] person subject to court order must comply to the fullest extent possible, regardless of whether such efforts result in compliance in whole or part.").

If the alleged contemnor makes an adequate showing of inability, the burden returns to the initiating party. *See Commodity Futures*, 950 F.2d at 1529.

## DEFENDANT'S ABILITY TO PAY

In this case, the only issue in dispute is whether Defendant had, at some point since the Judgment was entered in 2002, the ability to pay some or all of that Judgment. As stated above,

the SEC has the burden to show, clearly and convincingly, that Defendant had the ability to pay. *See Georgia Power Co.*, 484 F.3d at 1291. Based on the evidence presented, the SEC has met this burden.

At a very minimum, the SEC has shown that between 2004 and 2009, Defendant earned approximately $938,000 through a consulting contract and the 2007 settlement agreement. That he chose to route a portion of this income through J.D. Keith is irrelevant. *See Solow*, 682 F. Supp. 2d at 1319 ("[W]here the person charged with contempt is responsible for the inability to comply, impossibility is not a defense to the contempt proceeding.") (citation omitted). Given that the SEC has demonstrated Defendant's ability to comply, Defendant carries the burden to refute this evidence by showing that he is in fact unable to pay all or any portion of the Judgment.

To prevail on the impossibility defense, Defendant must demonstrate that he has made "in good faith all reasonable efforts" to meet the terms of the court order he is attempting to avoid. *See Commodity Futures*, 950 F.2d at 1529; *U.S. v. Roberts*, 585 F.2d 698, 701 (11th Cir. 1988). In an effort to demonstrate that he is unable to pay the Judgment in this case and has undertaken all reasonable efforts to do so, Defendant makes four general arguments: (1) he lacks ownership and control over the entities he manages and thus he cannot direct that funds of those entities be put towards the Judgment; (2) he has asked the Elise Trust to pay a portion of the Judgment and the Trustee directors denied his request; (3) even when he did have some available cash, that money could not have been put towards the Judgment because the money was owed to the IRS; and (4) his recent payments to the SEC are evidence of his good faith attempt to comply

with the Judgment. Based on the evidence presented, and for the reasons that follow, the Court finds these arguments to be unpersuasive.

As to the first argument, Defendant asserts that he is unable to pay the Judgment from the entities he manages because he does not own or control the entities. Although ownership of the various entities is unclear, the Court does not find that the Elise Trust is merely Defendant's alter ego insofar as the Trustee has been actively involved in decisions concerning the Trust, Defendant has no authority to appoint or control the Trustee, and Defendant cannot control the distribution of benefits from the Trust to the beneficiaries, etc. *Compare Miller v. Kresser*, 34 So. 3d 172, 176 (Fla. Dist. Ct. App. 2010) (finding that although the debtor exercised extensive control over a trust for which he was a beneficiary, his creditors could not reach the trust assets because he had no right to a distribution under the trust, and "the law requires that the focus must be on the terms of the trust and not the actions of the trustee or beneficiary")[3], *with In re Lawrence*, 279 F.3d at 1299 (agreeing with the district court that the alleged contemnor "retained de facto control over the Trust through his ability to appoint Trustees who could in their absolute discretion reinstate [the alleged contemnor] as a beneficiary and assign the entire proceeds to him."), *and Matter of Shurley*, 115 F.3d 333, 344 (5th Cir. 1997) (reversing a bankruptcy court's finding that a beneficiary exercised de facto control over a trust and holding that "[t]he fact that

---

[3] Florida law applies to the analysis of whether an entity is an alter ego of a debtor. *See, e.g., In re Vebeliuna*, 332 F.3d 85, 90 (2nd Cir. 2003) ("The question whether the 'alter ego theory' of piercing applies to trusts is a matter of state law."); *Dean v. United States*, 987 F. Supp. 1160, 1164 (W.D. Mo. 1997) ("It appears that state law controls the question of whether a third party is the alter ego of the taxpayer."); *see also Shades Ridge Holding Co. v. United States*, 888 F.2d 725, 728-29 (11th Cir. 1989), *as amended on denial of reh'g* (Sept. 29, 1989) (in a case dealing with piercing a corporation to satisfy tax liens, the Eleventh Circuit stated: "Although the district court found it unclear as to whether state or federal law governs this issue, the standards [regarding veil piercing] are so similar that the distinction is of little moment").

the trustees liberally bestowed trust assets on the [beneficiaries], by itself, does not establish de facto control by the [beneficiaries] over the affairs of the estate."), *and F.T.C. v. Affordable Media*, 179 F.3d 1228, 1242-43 (9th Cir. 1999) (affirming the trial court's finding that the contemnors were in control of the trust as "protectors," or co-trustees, of the trust). In any event, it is clear that Defendant has at least transferred income he is entitled to into J.D. Keith, co-mingled his and his wife's income in the Vantage Beach account, and has used various entities to pay personal expenses. Why he cannot similarly use these entities to pay some amount on the Judgment is not addressed, but it is clear that Defendant has not shown that he is in fact unable to do so.

Second, merely asking the Elise Trust for permission to pay some amount towards the Judgment in this case can hardly be used to show that Defendant has undertaken "all reasonable efforts." The Court finds it to be beyond belief that the Elise Trust would not agree to some compromise where Defendant himself has agreed that in all of his dealings with the Elise Trust, the Trustee has never expressed any kind of concern for the trust funds or expressed any concern that the trust funds were not being used in a way that was beneficial (DE 62, p. 50-51). Surely it is in the best interests of the Elise Trust to avoid having Defendant, whose efforts grew the trust fund from "about a million dollars to six or seven million dollars" between the time it was funded and 2011 (Def. Exh. 83, p.71), incarcerated. Regardless, there has not been any discussion by Defendant of any attempt whatsoever to economize his lifestyle to afford some payment towards the Judgment. At no point did Defendant ask the Elise Trust Trustee whether one of the vehicles at his disposal might be sold or traded for a less expensive vehicle and the proceeds directed towards the Judgment. Similarly, there has been no discussion of renting out

one of the homes leased by Defendant and his family when they are residing in the other home. Without any evidence of Defendant having undertaken such actions, it cannot be said that Defendant has undertaken all reasonable efforts.

Third, Defendant argues that he has been unable to pay the instant Judgment because all of the money he has had access to is paid to the IRS to satisfy outstanding tax liens. If this were indeed the case, it is unexplained how Defendant has recently been able to begin making monthly payments to the SEC despite the current outstanding tax lien. On this point, a review of Defendant's account transcript with the IRS shows that Defendant made no payments to the IRS in 2013, despite having earned at least $45,000 that year (Def. Exh's. 23, 31). It is similarly unexplained how Defendant was able to agree with the IRS to make monthly payments of $8,851 beginning in October 2005 (Def. Exh. 26) but has only offered less than half of that amount to satisfy this Judgment. Furthermore, Defendant avers in his pre-hearing brief that "in order to pay the IRS [to satisfy the outstanding tax liens], cash was withdrawn from business entities to obtain bank checks for payments to the IRS" (DE 50, p. 4). Why such similar maneuvers cannot be undertaken to satisfy the Judgment is unclear.

Fourth, Defendant asserts that the fact that he has begun paying the SEC in monthly installments that are equivalent to approximately fifty percent of his monthly net income, and he has offered to settle this case by continuing to pay an amount equal to fifty percent of his after-tax earned income is evidence of his good faith. Unfortunately for Defendant, this offer is a day late and many dollars short. Although distinguishable in several respects, this case is similar to *S.E.C. v. Musella*, in which the contemnor continued to plead inability to pay despite living a lavish lifestyle. *See Musella*, 818 F. Supp. 600 (S.D.N.Y. 1993). Like Defendant in the instant

case, the contemnor in *Musella* attempted to argue that a similar settlement offer and meager monthly payments were evidence of good faith. *See id.* at 602. Nevertheless, the court found that such evidence could not "be characterized as a reasonably diligent and energetic attempt to comply." *See id.* To the contrary, the contemnor's "purported good faith and diligence in attempting to meet his payment obligation . . . [was] belied by the fact that since the entry of the Judgment, he has continued to live what is, in essence, a quite comfortable lifestyle with no apparent thought of cutting back to meet some of his obligation." *See id.* at 609. The same finding can be applied here.

In sum, the SEC has clearly and convincingly shown that Defendant has, at some point since the Judgment was entered, been capable of at least partially satisfying the monetary judgment. In response, Defendant has failed to prove that he is either unable to pay the Judgment or that he has undertaken all reasonable efforts in an attempt to comply. Accordingly, a finding of contempt is warranted.

**APPROPRIATE SANCTIONS**

"District courts enjoy 'wide discretion to fashion an equitable remedy for [civil] contempt that is appropriate to the circumstances.'" *United States v. City of Miami*, 195 F.3d 1292, 1298 (11th Cir. 1999) (citing *E.E.O.C. v. Guardian Pools, Inc.*, 828 F.2d 1507, 1515 (11th Cir. 1987)). Nevertheless, "[c]ivil contempt sanctions may not be used to impose what amounts to a punitive or criminal contempt sanction." *See id.* That being said, civil sanctions generally serve one of two purposes: either (1) to coerce a contemnor to comply with a court order; or (2) to compensate a party for losses suffered as a result of the contemnor's act. *See id.* To prevent a sanction from becoming criminal in nature, incarceration may be used to obtain compliance only

where there is a reasonable possibility that the contemnor will comply with the order. *See In re Lawrence*, 279 F.3d 1294, 1300-01 (11th Cir. 2002); *see also Schiff v. Grenough*, 2012 WL 5493646, at *5 (M.D. Fla. Oct. 22, 2012), *report and recommendation adopted*, 2012 WL 5493616 (M.D. Fla. Nov. 13, 2012) ("[I]ncarceration may be used to obtain compliance only where the contemnors have the present ability to purge themselves of contempt and willfully fail to comply with the court order."). The party seeking a contempt order "bears the burden of providing the court 'with the basic evidentiary facts to formulate a realistic sanction to which the defendants could respond.'" *See Schiff*, 2012 WL 5493646, at *5 (citing *In re Chase & Sanborn, Corp.*, 872 F.2d 397, 401 (11th Cir.1989) (bankruptcy context)).

Based on Defendant's extensive involvement with the Elise Trust and related companies, the SEC suggests that the appropriate remedy to cure Defendant's contempt is an order requiring Defendant to repatriate and liquidate his assets and provide a full and complete accounting of his assets and income. To the extent Defendant has already been provided an opportunity to present a clear picture of his finances as a defense to this action but has failed to do so, a subsequent order to do so would be a waste of resources. As for the repatriation and liquidation, the SEC has failed to conclusively show that Defendant personally owns any assets. There is also insufficient evidence to pierce the Elise Trust under an alter ego theory, as discussed above. However, Defendant has failed to demonstrate that he is unable to pay the Judgment and has made all reasonable efforts to do so.

Given these limitations, the Court has considered other available sanctions, including fining Defendant or incarcerating him until he complies with the Judgment. *See Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1304 (11th Cir. 1991) ("The district court

[has] numerous options, among them: a coercive daily fine, a compensatory fine, attorney's fees and expenses . . . , and coercive incarceration."). Because Defendant's contempt is related to his failure to pay amounts due on a judgment, a sanction which includes a fine or award of attorney's fees would be futile. *See, e.g., S.E.C. v. Universal Exp., Inc.*, 546 F. Supp. 2d 132, 142 (S.D.N.Y. 2008) ("Imposing escalating fines on a defendant who has brazenly refused to pay an already large judgment would be an empty gesture."). Instead, the Court finds that incarceration is the appropriate coercive remedy. *See, e.g., Solow*, 682 F. Supp. 2d at 1334 (incarcerating contemnor where the contemnor failed to "make a showing that he made 'all reasonable efforts' to satisfy the judgment"); *Commodity Futures*, 950 F.2d 1525 (affirming the trial court's incarceration of a contemnor where he failed to take 'all reasonable efforts' to comply with a disgorgement order); *Universal Exp.*, 546 F. Supp. 2d at 142 ("Because [the contemnor] has been given every opportunity to comply, and has chosen not to do so, he will be incarcerated until he pays the disgorgement and prejudgment interest in full, or produces evidence demonstrating categorically and in detail that any further payment is impossible."). Given the efforts Defendant has undertaken to obscure his financial life and tie up funds that could otherwise be paid towards the Judgment, no lesser coercive sanction could conceivably produce compliance.

In proceeding with this recommendation, it is important to ensure that the sanction of incarceration does not become punitive in violation of Defendant's due process rights. *See Commodity Futures*, 950 F.2d at 1530-31 (discussing the risk that continuing to incarcerate a contemnor could lose its coercive effect if the contemnor has demonstrated that despite continued incarceration, he is unwilling or unable to comply). Accordingly, there must be some mechanism by which Defendant can cure his contempt. It is recommended that this mechanism

come in the form of incarcerating Defendant until he either satisfies the Judgment to the greatest extent he is able, or provides detailed evidence showing that he has undertaken all reasonable efforts to satisfy the Judgment but that his efforts have been unsuccessful. *See Int'l Union, United Mine Workers of Am. v. Bagwell,* 512 U.S. 821, 828 (1994) ("In these circumstances, the contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus carries the keys of his prison in his own pocket.") (internal quotes and citations omitted). By incarcerating Defendant with this caveat, the onus will be on Defendant to cure his intransigence, which he will undoubtedly have a strong motivation to do.

## **RECOMMENDATION**

In conclusion, it is **HEREBY RECOMMENDED THAT** the District Court **GRANT** the SEC's request as follows:

(1) Defendant shall be held in contempt; and

(2) Defendant shall be incarcerated until such time as he satisfies the Judgment to the greatest extent he is able, or provides evidence that he has taken all reasonable efforts to comply with the Judgment yet is unable to make any payment.

## **NOTICE OF RIGHT TO OBJECT**

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Daniel T. K. Hurley, Senior United States District Court Judge for the Southern District of Florida, within fourteen (14) days of being served with a copy of this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1) (2010) (providing that "within fourteen days

after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court."). *See also* Fed. R. Civ. P. 72(b)(2011) ("Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy"). Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained herein. *See LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988), *cert. denied*, 488 U.S. 958 (1988); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993).

**DONE and SUBMITTED** this 4th day of March, 2015, at West Palm Beach in the Southern District of Florida.

JAMES M. HOPKINS
UNITED STATES MAGISTRATE JUDGE